# In the United States Court of Federal Claims

<table>
<tr><td>

SCIENCE APPLICATIONS
INTERNATIONAL CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant,

and

MICROSOFT CORPORATION,

Intervenor-Defendant,

and

L3 TECHNOLOGIES, INC.,

Third-Party Defendant.

</td><td>

No. 17-cv-825

Filed Under Seal: December 14, 2023

Publication: January 9, 2024[1]

</td></tr>
</table>

*Gwendolyn Tawresey*, Troutman Pepper LLP, Washington, D.C. argued for Plaintiff.  With her on the briefs were *Orion Armon*, Cooley LLP, Denver, C.O.; and *DeAnna D. Allen* and *Stephen R. Smith* of Cooley LLP, Washington, D.C.

*Hayley A. Dunn*, United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant.  With her on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Washington, D.C.; and *Matthew D. Tanner*, *Scott Bolden*, and *Gary L. Hausken* of the United States Department of Justice, Civil Division, Washington, D.C.

*Thomas L. Halkowski* of Fish & Richardson P.C., Washington, D.C. for Intervenor-Defendant.  With him on the briefs were *Ahmed J. Davis*, *W. Freeman, Jr.*, *Daniel Y. Lee*, and *Laura C.*

---

[1] This Memorandum and Order was filed under seal, in accordance with the Protective Order entered in this case (ECF No. 34) and was publicly reissued after incorporating all appropriate redactions proposed by the parties (ECF No. 418-1).  The two versions are substantively identical, except for the publication date and this footnote.

*Whitworth* of Fish & Richardson P.C., Washington, D.C.; and *John Thornburgh*, Fish & Richardson P.C., San Diego, C.A.

*William C. Bergmann* of Baker & Hostetler LLP, Washington, D.C. argued for Third-Party Defendant.  With him on the briefs were *Charles C. Carson* and *Cassandra Simmons* of Baker & Hostetler LLP, Washington, D.C.; and *Phillip D. Wolfe* of Baker & Hostetler LLP, Philadelphia, P.A.

## MEMORANDUM AND ORDER

### I.   Introduction

On June 19, 2017, Plaintiff Science Applications International Corporation (SAIC) filed the present action alleging literal patent infringement pursuant to 28 U.S.C. § 1498(a) against Defendant the United States (the Government).  Complaint (ECF No. 1) (Compl.) ¶¶ 1–3.[2]  SAIC contends that the Government has infringed SAIC's patents "by entering into contracts with Plaintiff's competitors for the manufacture and subsequent use of night vision goggle weapon systems with specialized heads up displays that allegedly use Plaintiff's patented technology." *Sci. Applications Int'l Corp. v. United States*, 148 Fed. Cl. 268, 269 (2020); *see* Compl. ¶¶ 2, 37.

This Court has issued several opinions throughout the course of this litigation, familiarity with which is presumed.[3]  *See, e.g.*, *Sci. Applications Int'l Corp. v. United States*, 135 Fed. Cl. 661 (2018); *Sci. Applications Int'l Corp.*, 148 Fed. Cl. at 268; *Sci. Applications Int'l Corp. v. United States*, 154 Fed. Cl. 594 (2021); *Sci. Applications Int'l Corp. v. United States*, 156 Fed. Cl. 486 (2021); *Sci. Applications Int'l Corp. v. United States*, 161 Fed. Cl. 373 (2022); *Sci. Applications*

---

[2] Citations throughout this Memorandum and Order reference the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

[3] Since its inception in June 2017, this action has been reassigned four times to different judges. *See Sci. Applications Int'l Corp.*, 148 Fed. Cl. at 270; *see also* ECF No. 25 (Notice of Reassignment, dated April 5, 2018); ECF No. 68 (Notice of Reassignment, dated June 21, 2019); ECF No. 85 (Notice of Reassignment, dated July 23, 2019); ECF No. 113 (Notice of Reassignment to undersigned judge, dated February 27, 2020).

*Int'l Corp. v. United States*, 162 Fed. Cl. 213 (2022); *Sci. Applications Int'l Corp. v. United States*, 163 Fed. Cl. 257 (2022); *Sci. Applications Int'l Corp. v. United States*, No. 17-825 (Fed. Cl. Sept. 28, 2023) (ECF No. 401) (Combined Summary Judgment Opinion).  The following three motions are pending before this Court and are ripe for adjudication:

- Plaintiff SAIC's Daubert Motion to Exclude Testimony Regarding Alleged Non-Infringing Alternatives (ECF No. 350) (SAIC Daubert)[4]

- Plaintiff SAIC's Motion to Strike Untimely Non-Infringing Alternatives and Non-Infringement Theories (ECF No. 352) (SAIC MTS)[5]

- Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Expert Damages Report of David A. Haas (ECF No. 353) (Def. Daubert)[6]

The Court heard argument on these motions, and the motions are now ripe for adjudication.

Oral Argument Transcript, dated June 22, 2023 (ECF No. 400) (OA Tr.).  A background summary pertinent to the current motions follows.

---

[4] *See* Defendants' Response in Opposition to SAIC's Daubert Motion to Exclude Testimony Regarding Alleged Non-Infringing Alternatives (ECF No. 366) (SAIC Daubert – Def. Resp.); SAIC's Reply in Support of its Daubert Motion to Exclude Testimony Regarding Alleged Non-Infringing Alternatives (ECF No. 383) (SAIC Daubert – SAIC Reply).

[5] *See* Defendants' Opposition to SAIC's Motion to Strike Non-Infringing Alternatives and Non-Infringement Theories (ECF No. 367) (SAIC MTS – Def. Resp.); SAIC's Reply in Support of its Motion to Strike Untimely Non-Infringing Alternatives and Non-Infringement Theories (ECF No. 382) (SAIC MTS – SAIC Reply).  In the Court's Memorandum and Opinion dated September 28, 2023, the Court denied, in part, Plaintiff SAIC's Motion to Strike Untimely Non-Infringing Alternatives and Non-Infringement Theories (ECF No. 352), solely as it pertains to Microsoft's non-infringement theory.  Combined Summary Judgment Opinion at 19.  As such, the remainder of that motion is addressed by the present Memorandum and Order.

[6] *See* SAIC's Opposition to Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Expert Damages Report of David A. Haas (ECF No. 365) (Def. Daubert – SAIC Resp.); Joint Reply in Support of Defendants' Rule 702 Motion to Partially Exclude the Damages Report of David A. Haas (ECF No. 384) (Def. Daubert – Def. Reply).

### A.  Background

#### a.      The Alleged Infringing Parties

The Government has entered into several contractual arrangements with various parties to develop and manufacture the accused technology.  On May 9, 2014, the Government, acting by and through the Department of the Army (the Army), awarded two contracts for the procurement of the Enhanced Night Vision Goggle-III (ENVG-III) and the Family of Weapon Sights – Individual (FWS-I) to BAE Systems, Inc. (BAE) and DRS Networks & Imaging Systems, LLC (DRS).  Compl. ¶¶ 2, 37.  Neither BAE nor DRS have joined this suit.

On November 20, 2018, Intervenor-Defendant Microsoft Corporation (Microsoft) entered into a contract with the Government to develop an ██████████████████████████ ██████, which includes implementation of the Rapid Target Acquisition (RTA) feature relevant to SAIC's infringement claims.  *See* Microsoft's Unopposed Motion to Intervene Pursuant to Rule 24 (ECF No. 59) at 1.  On April 30, 2019, Microsoft filed an unopposed Motion to Intervene in this action under Rule 24 of the Rules of the United States Court of Federal Claims (Rules), which this Court granted on May 6, 2019.  *See id.*; Order Granting Intervention and Amending the Schedule, dated May 6, 2019 (ECF No. 60) (granting Microsoft's Motion to Intervene).  On September 28, 2023, this Court granted Microsoft's Motion for Summary Judgment of Non-Infringement.  Combined Summary Judgment Opinion at 98.

On May 30, 2019, the Army entered into two separate other transaction agreements (OTAs) with L3 Technologies, Inc. (L3) and Harris Corporation (Harris) to develop a prototype for an Enhanced Night Vision Goggle-Binocular (ENVG-B) that also requires implementation of the RTA technology at issue in this action.  *See* Memorandum and Order, dated May 12, 2020 (ECF No. 120) (May 12, 2020 Memorandum and Order) at 3.  Defendant filed a Motion to Notify L3

and Harris as interested third parties pursuant to Rule 14(b) on March 10, 2020, which this Court granted on May 12, 2020. *See* Motion to Notify Interested Party L3 Technologies, Inc. and Harris Corporation Pursuant to RCFC 14(b) (ECF No. 114); May 12, 2020 Memorandum and Order at 9–10 (granting Defendant's Motion to Notify L3 and Harris). Accordingly, Rule 14(b) notices were issued to L3 and Harris, care of Elbit Systems of America, LLC (Elbit),[7] on May 12, 2020. *See* Notice to Third Parties (L3 and Harris) pursuant to Rule 14(b)(1) (ECF No. 122). On July 14, 2020, L3 filed its Answer to SAIC's Complaint, entering the case as a third-party defendant. L3 Technologies, Inc. Answer (ECF No. 131). In contrast, Elbit filed a Notice with the Court declining to file any third-party pleadings. *See* Notice by Elbit Systems of America, LLC, dated July 29, 2020 (ECF No. 135).

### b.   The '230 Patent

The only patent remaining at issue in this action is U.S. Patent No. 9,229,230 (the '230 Patent). *See* Joint Stipulation of Invalidity and Motion for Partial Summary Judgment Regarding the Asserted Patents (ECF No. 208) at 2. The '230 Patent includes forty-two total claims, three of which are independent claims: claims 1, 15, and 29. *See generally* '230 Patent. Familiarity with the '230 Patent is presumed, as is this Court's September 28, 2023 Memorandum and Opinion, which includes a detailed explanation of the patent. Combined Summary Judgment Opinion at 8–16.

---

[7] Though the Government awarded Harris one of the May 30, 2019 OTAs, the division of Harris responsible for developing the company's night vision technology was spun-off and purchased by Elbit Systems of America, LLC (Elbit), which is the U.S. subsidiary of Elbit Systems, Ltd. *See* May 12, 2020 Memorandum and Order at 3 n.1.

### c.      Fact & Expert Discovery

The parties have invested considerable time and resources into discovery practice throughout the course of this action, including previously-filed motions to compel that the Court has denied.  *See* Order, dated June 1, 2022 (ECF No. 278) at 1.  Ultimately, fact discovery ended on August 9, 2022, and expert discovery ended on December 13, 2022.  *See* Scheduling Order, dated June 14, 2022 (ECF No. 285) at 2; Order, dated November 16, 2022 (ECF No. 326) at 2.

Four expert reports rest at the heart of the three pending motions.  On November 4, 2022, SAIC served Defendants with a copy of the Amended Expert Damages Report of David A. Haas, SAIC's damages expert.  *See* Def. Daubert at 7.  The report sought to amend Mr. Haas' original Expert Damages Report, dated September 30, 2022.  *See id.*  On November 22, 2022, Defendants served SAIC with rebuttal expert reports from Dr. Hany Farid, Defendants' source code expert; Dr. John Villasenor, Defendants' technical expert; and Ms. Kimberly Schenk, Defendants' damages expert.  *See* SAIC Daubert at 13.

### B.  Summary of Rulings

For the reasons stated in this Memorandum and Order, the Court orders the following disposition of the parties' three pending motions.  Plaintiff SAIC's Motion to Strike Untimely Non-Infringing Alternatives and Non-Infringement Theories (ECF No. 352) is **DENIED in part**, as it pertains to the non-infringing alternatives theories.[8]  Plaintiff SAIC's Daubert Motion to Exclude Testimony Regarding Alleged Non-Infringing Alternatives (ECF No. 350) is **DENIED**.

---

[8] *See supra* note 5 ("In the Court's Memorandum and Opinion dated September 28, 2023, the Court denied, in part, Plaintiff SAIC's Motion to Strike Untimely Non-Infringing Alternatives and Non-Infringement Theories (ECF No. 352), solely as it pertains to Microsoft's non-infringement theory.").

Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Expert Damages Report of Davis A. Haas (ECF No. 353) is **GRANTED in part and DENIED in part.**

## II.    Plaintiff's Motion to Strike

On March 13, 2023, SAIC filed a Motion to Strike urging the Court to strike Defendants' non-infringing alternatives theories as untimely and inadequately disclosed.[9]  *See generally* SAIC MTS.  Accordingly, SAIC moves to strike the following items from the record:

- Paragraphs 7, 11–19, 23, 24, 26–30, 65–70, and 128–30 from Appendix D to Dr. John Villasenor's Expert Report (ECF No. 350-1) (Villasenor Report Appendix D or Villasenor Rpt. App. D);

- Paragraphs 91–93 from Appendix C to Dr. John Villasenor's Expert Report (ECF No. 350-6) (Villasenor Report Appendix C or Villasenor Rpt. App. C);

- Paragraphs 98, 175, 177–82, 188, 198, 281, 286, 297, and 395–99 and associated calculations in Schedule 7.0 of Ms. Kimberly Schenk's expert report (ECF No. 350-2) (Schenk Report or Schenk Rpt.);

- Paragraphs 18–25 of Dr. Hany Farid's Rebuttal Expert Report on Infringement (ECF No. 350-9) (Farid Report or Farid Rpt.); and

- Paragraphs 2.a–2.e of the Declaration of Microsoft Witness ███████████ (ECF No. 352-15) ████████████████████.

*See* SAIC MTS at 9, 22, 34.

This Court previously denied in part SAIC's Motion to Strike, solely as it pertains to Microsoft's non-infringement theory.  *See supra* note 5; Combined Summary Judgment Opinion at 19.  The Court now addresses the remaining sections of SAIC's Motion to Strike regarding the timeliness of Defendants' non-infringing alternatives theories.  *See* Combined Summary Judgment Opinion at 17 n.14.

---

[9] SAIC's Motion to Strike also contested the timeliness of Microsoft's non-infringement theories. SAIC MTS at 23–33.  This Court's September 28, 2023 Memorandum and Order denied the Motion as it pertains to Microsoft's non-infringement theory.  *See* Combined Summary Judgment Opinion at 19.

Having considered the parties' arguments, applicable law, and the record, this Court **DENIES** SAIC's Motion to Strike Untimely Non-Infringing Alternatives and Non-Infringement Theories (ECF No. 352), as it pertains to the other modes non-infringing alternatives theory.  This Court **DENIES** as moot SAIC's Motion to Strike Untimely Non-Infringing Alternatives and Non-Infringement Theories (ECF No. 352), as it pertains to the ████████████ non-infringing alternative theory.

### A. Background

SAIC's Motion to Strike identifies two non-infringing alternatives theories introduced by Defendants.  First, Defendants contend that the accused devices possess other RTA modes, other than the allegedly infringing RTA mode, that serve as non-infringing alternatives.  Villasenor Rpt. App. C ¶ 92.  ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████  *See* Opening Expert Report of Dr. Chandrajit Bajaj, Ph.D. on Infringement of U.S. Patent No. 9,229,230 – Appendix A ¶ 22 (ECF No. 343-24) (citing GOV-0329407 at 12) ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████.  SAIC alleges that Microsoft's and L3's[10] accused devices implement this RTA mode in such a way that infringes upon the '230 Patent.  *See* SAIC MTS at 8 ("SAIC alleges that the ENVG-B, ENVG-III, and ████

---

[10] L3's equivalent of the RTA bubble mode is its "spatially aligned mode."  *See* Opening Expert Report of Dr. Chandrajit Bajaj, Ph.D. on Infringement of U.S. Patent No. 9,229,230 (ECF No. 340-3) (Bajaj Opening Report or Bajaj Op. Rpt.) ¶ 110 ███████████████████████████
██████████ *see also* SAIC MTS at 8 (naming "spatially aligned mode" as L3's allegedly infringing mode).

night vision goggles and weapon systems infringe the '230 Patent through use of 'spatially aligned' or 'bubble' mode in the Rapid Target Acquisition ('RTA') functionality.").

Defendants contend, however, that the accused devices offer two alternative, non-infringing RTA modes. L3's ENVG-B system and Microsoft's ███ devices offer three different RTA modes—the Picture-in-Picture (PiP) mode, full weapon sight (FWS) mode, and accused spatially aligned or bubble mode. *See* Villasenor Rpt. App. C ¶¶ 92, 92 n.40. SAIC has not accused either the PiP mode or FWS mode of infringing the '230 Patent. *See* SAIC MTS at 6 ("SAIC alleges that one mode of Rapid Target Acquisition ('RTA') infringes the asserted claims. There are two other RTA modes that are not accused."). As such, Defendants argue that ████

████████████████████████████████████████████████████████████████████████

████████████████████ Villasenor Rpt. App. C ¶ 92.

The second non-infringing alternative theory posited by Defendants is that Microsoft's ███ devices can operate in bubble mode without infringing the '230 Patent by ████████████ ████████████████████. *See* Schenk Rpt. ¶ 281 ████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████;

Microsoft Corporation's First Supplemental Response to SAIC's Fourth Set of Interrogatories (No. 19) (ECF No. 350-4) (Microsoft's Resp. to Interrog. No. 19) at 5 ████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████. SAIC's

9

Motion to Strike contests the timeliness and adequacy of Defendants' disclosure of the two aforementioned non-infringing alternatives theories.

### B.  Applicable Legal Standards

Rule 33 governs interrogatories between parties.  *See* Rule 33(b)(3) ("Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath."). During fact discovery, parties may issue contention interrogatories to "discover the factual basis of the allegations in a complaint, answer, or counterclaim, or to determine the theory of the opposing party's case."  *Contention Interrogatory*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Rule 26(a)(2) governs disclosures related to parties' expert witnesses.  Specifically, an expert's report must contain "a complete statement of all opinions the [expert] witness will express and the basis and reasons for them."  Rule 26(a)(2)(B)(i).  "A party must make these disclosures at the times and in the sequence that the court orders."  Rule 26(a)(2)(D).

Rule 26(e)(1) imposes a duty on parties to supplement their interrogatory responses and expert reports in certain circumstances:

> A party who has made a disclosure under [Rule] 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or . . . as ordered by the court.

Rule 26(e)(1)(A)–(B).  Additionally, "[f]or an expert whose report must be disclosed under [Rule] 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition."  Rule 26(e)(2).

Failure to comply with these disclosure requirements can result in sanctions.  Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by [Rule] 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion,

at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Rule 37(c)(1).  The decision to impose sanctions and the extent of any such sanctions are at the trial court's discretion.  *See* Rule 37(c)(1)(A)–(C) ("In addition to *or instead of* [the exclusion] sanction, the court, on motion and after giving an opportunity to be heard . . . *may* order payment of the reasonable expenses, including attorney's fees, caused by the failure . . . [and] *may* impose other appropriate sanctions . . . .") (emphasis added); *see, e.g., Precision Pine & Timber, Inc. v. United States*, No. 98-720 C, 2001 WL 1819224, at *3 (Fed. Cl. Mar. 6, 2001) (citing *Adkins v. United States*, 816 F.2d 1580, 1581–82 (Fed. Cir. 1987)) ("The decision on whether to impose discovery sanctions, either pursuant to its inherent authority or under existing Rules of the Court of Federal Claims rests within the sound discretion of the Court."); *Bowman Constr. Co. v. United States*, No. 18-1822C, 2020 WL 1970546, at *3 (Fed. Cl. Apr. 23, 2020) (quoting *Ingalls Shipbuilding, Inc. v. United States*, 857 F.2d 1448, 1450 (Fed. Cir. 1988)) ("The decision whether to impose discovery sanctions rests within the sound discretion of the trial court.").

A party that fails to meet its discovery obligations may avoid sanctions if it demonstrates that its failure was either "substantially justified or is harmless."  Rule 37(c)(1); s*ee, e.g., Zoltek Corp. v. United States*, 71 Fed. Cl. 160, 167 (2006) ("Circuit courts applying the federal rule have held that the sanction of exclusion is automatic and mandatory unless the party violating [Rule] 26 shows that the violation was justified or harmless."); *Scott Timber, Inc. v. United States*, 93 Fed. Cl. 221, 226 (2010) (noting "the burden is on the offending party to show that its violation was either justified or harmless" and citing as support cases from the First, Fifth, and Seventh Circuits). This Court has wide discretion to determine whether a non-disclosing party's conduct was "substantially justified or harmless."  *See, e.g., Hanover Ins. Co. v. United States*, 137 Fed. Cl. 479, 483 (2018) (citing *Cohen v. United States*, 100 Fed. Cl. 461, 468 (2011)).

When determining whether a disclosure failure warrants sanctions or, rather, was "substantially justified or harmless," this Court may consider a variety of factors: (1) prejudice or surprise to the opposing party; (2) ability to cure that prejudice or surprise; (3) the importance of the challenged evidence; (4) the extent to which admitting the evidence would disrupt trial; (5) the non-disclosing party's explanation for their conduct; and (6) whether the party acted in bad faith or willfully.[11]  *See, e.g.*, *SAIC*, 163 Fed. Cl. at 272–73; *see also MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1357 (Fed. Cir. 2005) (quoting *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003)) (referencing a five-factor test that included surprise, ability to cure surprise, disruption of trial, the importance of the testimony, and the party's

---

[11] Though some courts have required a showing of willfulness or bad faith prior to imposing sanctions, such a requirement is not universally applied.  *See, e.g.*, *SAIC v. United States*, 162 Fed. Cl. 257, 272 n.19 (2022) (discussing decisions by various circuits and whether those courts required a showing of willfulness).  Typically, courts will not sanction by dismissing a case, or imposing a sanction tantamount to dismissal, absent a showing of willfulness or bad faith.  *See, e.g.*, *Intelligent Invs., Inc. v. United States*, No. 2021-2310, 2022 WL 17075056, at *1 (Fed. Cir. Nov. 18, 2022) ("[W]e conclude that the Claims Court abused its discretion by dismissing the case without finding that the noncompliance was willful or in bad faith . . . ."); *Securiforce Int'l Am. LLC v. United States*, 127 Fed. Cl. 386, 396 (2016) (quoting *Ingalls Shipbuilding, Inc.*, 857 F.2d at 1451) (noting sanctions such as "de facto dismissal" necessitate a showing of bad faith or willfulness, although Rule 37 does not explicitly state such a requirement).  However, courts have not demonstrated a clear consensus whether demonstration of bad faith or willfulness is necessary prior to imposing lesser sanctions. *Compare Toyrrific, LLC v. Karapetian*, 606 F. App'x. 365 (9th Cir. 2015) (declining to affirm evidentiary exclusion for a Rule 26 violation that had no evidence of bad faith) *with Zoltek*, 71 Fed. Cl. at 168 (refusing to require showing of bad faith and "instead choosing to subsume it into the justification requirement in analyzing the explanation for the party's failure to disclose").  Instead, courts consider whether the sanction is proportionate to the offending party's discovery conduct. *See, e.g.*, *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 917 (Fed. Cir. 2022) ("And, while district courts may impose [discovery] sanctions for deterrent effects, the size of the award must bear a reasonable relationship to the harm that occurred."); *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 740 (7th Cir. 1998) (quoting *Melendez v. Illinois Bell Tel. Co.*, 79 F.3d 661, 672 (7th Cir. 1996)) (refusing to grant dismissal sanctions that were not "proportionate to the circumstances surrounding [the] party's failure to comply with discovery rules"); *Canvs Corp. v. United States*, 104 Fed. Cl. 727, 733 (2012) (acknowledging that the discovery sanction imposed was a "fair and appropriate sanction proportional to the misconduct in question").

explanation for its failure to disclose); *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (identifying a four-factor test considering prejudice or surprise to the party, the ability to cure surprise, the likelihood of disruption to trial, and the bad faith or willfulness of the non-disclosing party); *Hitkansut LLC v. United States*, 127 Fed. Cl. 101, 107 (2016) ("[T]he court may consider surprise to the other party, whether there is opportunity to cure that surprise, the proponent's need for the evidence at trial, or other factors."); *Banks v. United States*, 75 Fed. Cl. 294, 298–99 (2007) (summarizing the various tests that courts have applied and adopting the approach applied by the Third, Seventh, and Tenth Circuits).

### C. Discussion

SAIC contends that Defendants' allegedly belated disclosure of their two non-infringing alternatives theories prejudiced SAIC.  Specifically, SAIC alleges that it only learned of Defendants' other modes theory via Defendants' rebuttal expert reports, and that Microsoft waited until the last day of discovery and after the completion of all depositions to contend that ████ ███████████████████████████████████████████████████.  SAIC MTS at 6.  As SAIC argues that the delay was not justified and the resulting prejudice is incurable, SAIC urges the Court to strike Defendants' theories and preclude Defendants from presenting such theories at trial.  *Id.*

#### a.  Other Modes Theory

SAIC argues that "Defendants sprang the new [other modes] theory" for the first time in rebuttal expert reports, thereby depriving it of the opportunity to depose Defendants' fact witnesses, request additional discovery, or address the theory in its own expert reports.  *Id.* at 22. However, SAIC's arguments fail to account for the fact that SAIC was aware of the other modes as non-infringing alternatives as early as May 2, 2022.  *See* L3's Response to SAIC's Second Set

of Interrogatories (Nos. 11–18) (ECF No. 367-2) (L3 Resp. to SAIC Second Set of Interrog.) at

10–11, 18.  On March 31, 2022, SAIC served L3 with Interrogatory No. 14, stating:

> To the extent You contend that non-infringing alternatives concerning the RTA
> Spatial Alignment functionality of the Accused Instrumentalities exist, identify and
> describe each noninfringing alternative and the basis for your contention that it is
> or was non-infringing, acceptable, and available to You, as well as when it became
> available to You and the itemized cost of implementing each such non-infringing
> alternative, including without limitation continuing operational costs, direct and
> indirect implementation costs, and opportunity costs.

L3 Resp. to SAIC Second Set of Interrog. at 10; SAIC MTS – Def. Resp. at 9.  L3 responded on

May 2, 2022, stating:



L3 Resp. to SAIC Second Set of Interrog. at 11 (emphasis added).  Thus, SAIC was aware of

Defendants' intent to further a non-infringing alternative theory based on the other RTA modes

three months prior to the end of fact discovery and six months prior to receiving Defendants'

rebuttal expert reports.  *See* Scheduling Order, dated June 14, 2022 (ECF No. 285); *see also* SAIC

Daubert at 13.

      In response, SAIC attempts to argue that L3's interrogatory response is insufficient to

constitute adequate notice of Defendants' other modes theory.  SAIC MTS – SAIC Reply at 10.

Specifically, SAIC takes issue with portions of the interrogatory that it claims remain unanswered

by L3's response—requests for the basis of L3's contention that its alternative is non-infringing,

acceptable, and available; when the alternative became available; and the itemized cost of

implementing the alternative.  *Id.*  Yet, prior to its Motion to Strike, SAIC never sought

clarification from L3 on its response, requested further written discovery on the topic, or raised any concerns with the adequacy of L3's response.[12]  *See* SAIC MTS – Def. Resp. at 10.

Further, SAIC's citation in support of its position is inapposite.  SAIC MTS – SAIC Reply at 10 (citing *ICM Controls Corp. v. Honeywell Int'l Inc.*, No. 15:12-CV-1766, 2021 WL 3403734, at *3 (N.D.N.Y. Aug. 4, 2021)).  While the Court in *ICM Controls Corp.* did, in fact, exclude evidence of non-infringing alternatives on account of the lack of notice to the patentee due to "vague and general language" in the interrogatory response, the record in front of this Court is distinguishable from that in *ICM Controls Corp.*  *See* 2021 WL 3403734, at *3.  As explained in *ICM Controls Corp.*, "when the alternatives at issue are hypothetical and never existed on the market . . . the burden shifts to the alleged infringer to demonstrate that the non-infringing alternative would have been available" and the accused infringer should "alert[] [the patentee] of its proposed non-infringing alternatives."  *Id.*  In contrast, the other RTA modes named as non-infringing alternatives in L3's response are not merely hypothetical but are already built into the accused products.  *See* Villasenor Rpt. App. C ¶¶ 92, 92 n.40.  Additionally, unlike the defendant in *ICM Controls Corp.*, which merely posited potential unnamed, unspecified alternatives in its interrogatory response, L3 specifically identified the other RTA modes as non-infringing alternatives.  *Compare ICM Controls Corp.*, 2021 WL 3403734, at *2 (noting Defendant's

---

[12]  It is the responding party, i.e., Defendants, who have "an affirmative duty to amend a prior response if it is materially incomplete or incorrect."  *Zoltek*, 71 Fed. Cl. at 164.  In evaluating whether Defendants had an affirmative duty, the Court considers the following four factors: "(1) whether there was a prior response; (2) whether the response became materially incorrect or incomplete; (3) whether the [party] knew that the response was incomplete; and (4) whether the corrective information was otherwise made known to [the movant] through the discovery process or in writing."  *Id.*  Whether the opposing party requested further clarification—for example, through a motion to compel—is relevant to this inquiry.  *See id.* at 166 (explaining how Defendant was "on notice" that its interrogatory response was incomplete due to multiple requests from Plaintiff for additional information).

interrogatory response merely stated, "Discovery revealed the existence of several non-patented competing designs that were in public use during the relevant period when [the accused infringer] could have redesigned the accused products") *with* L3 Resp. to SAIC Second Set of Interrog. at 11

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████.

Even if this Court were to construe L3's interrogatory response as somehow inadequate, the record in front of this Court indicates that any such failure would be "substantially justified or [] harmless." Rule 37(c)(1); s*ee Zoltek*, 71 Fed. Cl. at 167. Arguably, the main purpose of SAIC's Interrogatory No. 14 was to ascertain whether Defendants intended to put forth any non-infringing alternatives. *See* L3 Resp. to SAIC Second Set of Interrog. at 10–11. While L3 may not have responded with the degree of specificity that SAIC had desired, L3's response, nonetheless, adequately conveyed the fact that it would claim the other RTA modes as non-infringing alternatives; in doing so, L3 effectively eliminated, or at least diminished, the potential for surprise to SAIC. *See Hitkansut LLC*, 127 Fed. Cl. at 107 ("[T]he court may consider surprise to the other party . . . ."). Additionally, as explained further below, SAIC had the opportunity to depose Defendants' fact witnesses on the factual underpinnings of the non-infringing alternatives theories. With the Interrogatory Response, deposition testimony, and expert opinions in hand, SAIC has ample evidence on the record to formulate a counterargument to Defendants' other modes non-infringing alternatives theory and to challenge the theory at trial without prejudice.

SAIC, however, further claims that Defendants tried to "have it both ways" by preventing SAIC from deposing Defendants' witnesses, such as Jason Coffman, L3's Rule 30(b)(6) witness, and Dean Kissinger, an Army representative, on non-infringing alternatives theories, but then relying on conversations between those same witnesses and their expert witnesses to further non-

infringing alternatives theories.  SAIC MTS – SAIC Reply at 11.  SAIC bases its claim on L3's objection to its notice of depositions, namely L3's objection to SAIC's "Deposition Topic No. 48," which focuses on non-infringing alternatives.  *Id.*; *see also* L3 Technologies, Inc.'s Responses and Objections to Plaintiff's Notice of Deposition Under Rule 30(b)(6) (ECF No. 367-5) (L3's Resp. and Obj. to Notice of Depo.) at 3–4.  In its response, L3 "object[ed] to this topic as seeking premature expert discovery that will be addressed at the appropriate time during expert discovery." L3's Resp. and Obj. to Notice of Depo. at 4.  While L3 did limit the scope of deposition testimony to exclude any improper lay opinion testimony on technical conclusions as to non-infringing alternatives, it did not institute a wholesale ban on any and all questions related to the other RTA modes.  *See* SAIC MTS – Def. Resp. at 14–15.  Instead, in emails leading up to the depositions, L3's counsel clarified that its "witnesses will be prepared to testify about other modes to a reasonable degree . . . ." *Id.* at 15.

As indicated by the record, Defendants' witnesses did, in fact, provide testimony on the other modes, and SAIC's counsel had the opportunity to ask questions regarding the other modes when pertinent to the testimony of the witnesses being deposed.  During his deposition, Mr. Coffman testified that ████████████████████████████████████████████ ███████████████████████████████████████████.  *See* Deposition of Jason Coffman, dated July 29, 2022 (ECF No. 367-3) (Coffman Depo. Tr.) at 75:21–77:14, 79:11–80:7.  Mr. Kissinger was also deposed on ██████████████████████ ███████████████████████████████████████████ ██████████████████.  Deposition of Dean Kissinger, dated August 5, 2022 (ECF No. 367-4) (Kissinger Depo. Tr.) at 183:19–184:23. While these witnesses did not testify as to how the other modes technically constitute non-infringing alternatives, it was not their role to do so.

Rather, they testified ██████████████████████, and in doing so, they laid out the factual underpinnings of Dr. Villasenor's technical opinion on the other modes non-infringing alternatives theory. *See* Villasenor Rpt. App. C. ¶¶ 91–94.

SAIC also contests the applicability of the other modes theory to Microsoft's ████ devices.[13]   SAIC MTS – SAIC Reply at 8–9.   However, as previously explained, this Court has already granted Microsoft's Motion for Summary Judgment, finding that "Microsoft has provided substantial fact and expert testimony demonstrating that its accused devices do not practice the 'display' operation according to the '230 patent's proper claim construction."   Combined Summary Judgment Opinion at 151.   As such, SAIC's arguments contesting the applicability of the other modes theory to Microsoft are now moot and are accordingly **DENIED**.

As L3 timely disclosed the other modes non-infringing alternatives theory and SAIC had ample opportunity to address the factual underpinnings of the theory, SAIC's arguments contesting the timeliness and adequacy of Defendants' disclosure of the other modes non-infringing alternatives theory are **DENIED**.

---

[13] SAIC argues that L3's interrogatory response does not apply to Microsoft on account of L3's objection to the inclusion of ████ in the definition of "Accused Instrumentalities."  SAIC MTS – SAIC Reply at 8; *see also* L3 Resp. to SAIC Second Set of Interrog. at 3–4 ("L3 objects to the definition of 'Instrumentalities' set forth in the Definitions and Instructions on the grounds that is [sic] vague, ambiguous, overly broad and seeks information that is not relevant to any claim or defense to the extent that it would purport to include any products not specifically identified in Plaintiff's Infringement Contentions to the U.S. Government, and to the extent that it refers to 'Systems, developed, made or provided by You or Your contractors, subcontractors, or suppliers that include an ████ . . . .").  SAIC also argues that Dr. Villasenor's and Ms. Schenk's reliance on conversations with Mr. Coffman and Mr. Kissinger, who purportedly have no personal knowledge of Microsoft's ████ devices, further supports its position that the other modes theory does not apply to ████.  SAIC MTS – SAIC Reply at 9.

**b.** ███████████ **Theory**

SAIC alleges that Microsoft belatedly disclosed its intent to present a non-infringing alternative theory based on its purported ability to █████████████████. SAIC MTS at 18–21. SAIC argues that Defendants should have, instead, disclosed this theory earlier, when SAIC still had the opportunity to seek full discovery to address and counter Defendants' ████████ non-infringing alternative theory. *Id.*

As noted, this Court has already granted Microsoft's Motion for Summary Judgment, holding that Microsoft's █████ devices do not operate in such a way as to infringe the '230 Patent. Combined Summary Judgment Opinion at 151. Therefore, SAIC's arguments contesting the timeliness and adequacy of Microsoft's disclosure of its ███████ non-infringing alternative theory are **DENIED** as moot.

**D.  Conclusion**

For the foregoing reasons, this Court **DENIES** SAIC's Motion to Strike Untimely Non-Infringing Alternatives and Non-Infringement Theories (ECF No. 352), as it pertains to Defendant's other modes non-infringing alternatives theory, and **DENIES** as moot SAIC's Motion to Strike Untimely Non-Infringing Alternatives and Non-Infringement Theories (EFC No. 352), as it pertains to the ███████ non-infringing alternative theory.

**III.   Daubert Motions**

On March 13, 2023, the parties filed competing Daubert motions seeking the exclusion of certain expert testimony and, at times, the testimony of fact witnesses relied upon by experts.

*First*, SAIC filed a Daubert motion urging the Court to exclude testimony by Defendants' experts on alleged non-infringing alternatives. Specifically, SAIC alleges that the testimony from Dr. Villasenor, Dr. Farid, and Ms. Schenk fail to satisfy the requirements of Federal Rules of

Evidence (FRE) 702 and 703.  SAIC Daubert at 6, 16–29; *see also* FED. R. EVID. 702, 703. Accordingly, SAIC seeks to exclude the following portions of Defendants' expert reports and preclude Defendants from presenting on the theories espoused therein at trial:

- Paragraphs 32, 34, 36, 37, 43, 128–30 of Appendix D to Dr. Villasenor's rebuttal report;

- Paragraphs 36, 37, 40–45 of Dr. Farid's report;

- Paragraphs 91–94, including footnote 40, of Appendix C to Dr. Villasenor's rebuttal report; and

- Paragraphs 96, 98, 175, 177–82, 188, 198, 281, 297, 396–99 and associated calculations in Schedule 7.0 from Ms. Schenk's rebuttal report.

*See* SAIC Daubert at 8–9.  SAIC also seeks to prevent Microsoft from allegedly introducing expert testimony at trial through Microsoft fact witnesses, such as ███████████ and ██ ████████████.  *Id.* at 9.

Second, Defendants jointly filed a Daubert motion to partially exclude Dr. Haas' amended damages report on the basis it fails to satisfy FRE 702 in reaching conclusions that are allegedly legally erroneous, unreliable, and unsupported by the evidence.  Def. Daubert at 6; *see also* FED. R. EVID. 702.  Accordingly, Defendants seek to exclude the following portions of Mr. Haas' report and testimony on the same at trial:

- Mr. Haas' opinion that if the Court chooses to award lump sum damages, SAIC would be entitled to royalties on "Future Accused Units;"

- Mr. Haas' opinion regarding apportionment;

- Mr. Haas' opinion based on the value of spare parts;

- Mr. Haas' opinion that SAIC is entitled to damages for "Accused Development Spend."

Def. Daubert at 6.

Having considered the parties' arguments, applicable law, and the record, this Court **DENIES** SAIC's Daubert Motion to Exclude Testimony Regarding Alleged Non-infringing

Alternatives (ECF No. 350), as it pertains to non-Microsoft-based theories and witnesses; **DENIES** as moot SAIC's Daubert Motion to Exclude Testimony Regarding Alleged Non-infringing Alternatives (ECF No. 350), as it pertains to Microsoft-based theories and witnesses; **GRANTS** Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Expert Damages Report of David A. Haas (ECF No. 353), solely as it pertains to the "Future Accused Units" argument; **DENIES** Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Expert Damages Report of David A. Haas (ECF No. 353), as it pertains to the apportionment and spare parts arguments; and **DENIES** as moot Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Expert Damages Report of David A. Haas (ECF No. 353), solely as it pertains to the "Accused Development Spend" argument.

## A. Background

At the core of the competing Daubert motions is the admissibility of various opinions and conclusions reached by the parties' expert witnesses: Ms. Schenk, Dr. Villasenor, Dr. Farid, and Mr. Haas.  Background relevant to (a) SAIC's Daubert Motion, and (b) Defendants' Daubert Motion is explained further below.

### a. Relevant Background Regarding Plaintiff SAIC's Daubert Motion to Exclude Testimony Regarding Alleged Non-Infringing Alternatives

On November 22, 2022, Defendants served SAIC with three rebuttal expert reports from Ms. Schenk, Dr. Villasenor, and Dr. Farid, respectively.  *See* SAIC Daubert at 13.  Ms. Schenk, Defendants' damages expert, largely focuses her report on calculating a potential damages amount, including by factoring in the value of the non-infringing alternatives posited by Dr. Villasenor. SAIC Daubert at 13–14; *see* Schenk Rpt. ¶¶ 177–82.  In calculating any potential damages amount, Ms. Schenk follows the *Georgia-Pacific* criteria to determine a hypothetically negotiated royalty rate.  *See* Schenk Rpt. ¶ 97 ██████████████████████████

███████████████████████████████████████████████. For
example, Ms. Schenk considers ████████████████████████████████
███████████████████████████████████████████████████████
███████████████████ *Id.* at 7.  In assessing this *Georgia-Pacific* factor, Ms. Schenk compares
the three RTA modes, citing to conversations with Mr. Kissinger, Mr. Coffman, and Dr. Villasenor
as well as relying on Dr. Villasenor's rebuttal report.  *See, e.g.*, *id.* ¶¶ 177–78.  Another factor Ms.
Schenk considers is ████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████ *Id.* at 11.  Ms. Schenk explains that █████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████ *Id.* ¶ 198.  Ms. Schenk also uses her report to respond to SAIC's
damages expert, Mr. Haas.  *See id.* ¶¶ 281, 297, 396–99.  In doing so, she references potential non-
infringing alternatives and cites to Dr. Villasenor's report, conversations with Dr. Villasenor, and
conversations with fact witnesses.  *See, e.g.*, ¶281 n.511.

Dr. Villasenor, Defendants' technical expert, spends time in his report on potential non-
infringing alternatives theories.  Villasenor Rpt. App. C ¶¶ 91–94; *see* SAIC Daubert at 13.  As
previously previewed in this Court's discussion of SAIC's Motion to Strike, these non-infringing
alternatives theories are the other modes theory, in which Defendants claim that two of the RTA
modes serve as non-infringing alternatives, and the ████████ theory, in which Defendants
claim that Microsoft's ██████████████████████████████████████████

████████████   *See supra* Section II(A); *see also* SAIC Daubert at 13.  As it pertains to the other

modes theory, Dr. Villasenor explains:



Villasenor Rpt. App. C. ¶ 92.  He also notes that ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████   *Id.* ¶ 93.

Dr. Farid, Defendants' source code expert, focuses his report on Microsoft's ██████████,

concluding that ████████████████████   Farid Rpt. ¶¶ 40, 42; *see* SAIC Daubert at 13;

SAIC Daubert – Def. Resp. at 14.  Defendants characterize Dr. Farid's role as a narrow one,

focused solely on studying Microsoft's source code.  SAIC Daubert – Def. Resp. at 14.

> **b.  Relevant Background Regarding Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Damages Report of David A. Haas**

On November 4, 2022, SAIC served Defendants with the Amended Expert Damages

Report of its damages expert, Mr. Haas.  *See* Def. Daubert at 7.  In his report, Mr. Haas proposes

two potential methods through which damages could be determined.  Under the first method,

damages would be calculated for past infringement from January 11, 2016 to September 30, 2022.

Am. Haas Rpt. ¶ 14.  Under the second method, damages would be calculated as a lump sum for

past infringement as well as "Defendant's Future Accused Units" from January 11, 2016 to

December 31, 2027.  *Id.* ¶¶ 16, 93.  Under both methods of calculating damages, Mr. Haas includes

purported damages from the "Accused Development Spend," comprised of ██████████████

████████████████████████████████████████████████████████████   Def.

Daubert at 8; Am. Haas Rpt. ¶¶ 14, 16, 92.

Central to Mr. Haas' report is his method of apportionment.  Apportionment is the practice of identifying the smallest saleable patent unit (SSPPU) and where the SSPPU is a multi-component product, proceeding to "estimate what portion of the value of that product is attributable to the patented technology."  *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327–28 (Fed. Cir. 2014).  Mr. Haas opines that at least one-third of the value of the RTA technology should be apportioned to RTA bubble mode.  Am. Haas Rpt. ¶ 163.

As part of his apportionment process, Mr. Haas attempts to estimate the value of the RTA technology as a whole.  *Id.* ¶¶ 164–66.  To do so, Mr. Haas employs two methods.  Under the first method, he compares the value of a product that includes the RTA technology, such as the ENVG-B device, with a product that does not include the RTA technology, such as the SBNVG device.  *Id.* ¶ 164.  Under the second method, he compares the value of spare parts that incorporate the RTA technology with the value of spare parts that do not incorporate the RTA technology.  *Id.* ¶¶ 165–66.

## B.  Applicable Legal Standards

Pursuant to FRE 702, a witness qualified as an expert may provide expert testimony if four requirements are met.  FED. R. EVID. 702.  First, an expert may testify if his "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  FED. R. EVID. 702(a).  Second, the expert's testimony must be "based on sufficient facts or data."  FED. R. EVID. 702(b).  Third, the expert's testimony must be "the product of reliable principles and methods."  FED. R. EVID. 702(c).  Fourth, "the expert's opinion [must] reflect a reliable application of the principles and methods to the facts of the case."  FED. R. EVID. 702(d).

At issue in the present motions is the requirement that expert testimony be "the product of reliable principles and methods." Fed. R. Evid. 702(c); *see* SAIC Daubert at 6; Def. Daubert at 6. When considering whether a methodology is reliable, the Court may consider: (1) whether the theory is testable; (2) whether the theory has been peer reviewed and published; (3) a theory's rate of error; (4) whether the theory is subject to standards and controls; and (5) the scientific community's acceptance of a theory. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–95 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (applying the *Daubert* principles to technical and specialized expert testimony). These factors, however, are not definitive and "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Kumho Tire Co.*, 526 U.S. at 151. For example, at times, it may be more appropriate to evaluate reliability by focusing on an expert's personal knowledge or experience. *Id.* at 150.

The reliability requirement of an expert's principles and methods applies equally to the legal sufficiency of an expert's opinions. As such, "[i]ncorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories." *Herbert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015) ("Under these rules, a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case.").

As a "distinct but integral part of that [reliability] inquiry," the Court must also determine whether the data or facts underlying an expert's methodology are "sufficiently tied to the facts of the case." *Summit 6*, 802 F.3d at 1296; *see also Daubert*, 509 U.S. at 591 (explaining there must be an adequate "fit" between expert testimony and the facts of the case). If the "analytical gap

between the data and the opinion proffered" is "simply too great," then the Court must exclude the expert's testimony. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). If, however, the Court deems "the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *I4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010).

FRE 703 governs the type of evidence that experts may consider in formulating their opinions. Specifically, FRE 703 permits experts to rely on otherwise inadmissible evidence "if their probative value in helping . . . evaluate the opinion substantially outweighs their prejudicial effect." FED. R. EVID. 703. As such, experts may rely on hearsay evidence to form their opinions, but only after "applying [their] extensive experience and a reliable methodology to the inadmissible materials." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (internal quotations omitted).

In general, Daubert inquiries are flexible, and the Court's role is best described as that of a "gatekeeper." *Daubert*, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."); *Trin-Co Investment Co. v. United States*, 130 Fed. Cl. 592, 596–97 (2017). As emphasized by the Supreme Court in *Daubert*, this role is a limited one in which the Court must be careful to focus its review "solely on principles and methodology, not on the conclusions that they generate." *Summit 6*, 802 F.3d at 1295 (quoting *Daubert*, 509 U.S. at 595). The Court should be careful, therefore, not to "overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed.

Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).

### C. Discussion

SAIC and Defendants have each filed Daubert motions contesting the admissibility of the opposing parties' expert testimony.  SAIC contends that Defendants' experts, Ms. Schenk, Dr. Villasenor, and Dr. Farid, reached their conclusions concerning damages and non-infringing alternatives solely through conversations with fact witnesses and failed to conduct any independent testing or analysis.  SAIC Daubert at 6.  Further, SAIC claims that the fact witnesses relied upon by Defendants' experts would be testifying on "hypothetical non-infringing alternatives that do not exist."  *Id.* at 7.  SAIC submits that such testimony would run afoul of FRE 602's requirement that fact witnesses testify only to facts in their personal knowledge.  *Id.*; *see also* FED. R. EVID. 602.

Defendants, in turn, move to partially exclude portions of the report of SAIC's damages expert, Mr. Haas.  *See generally* Def. Daubert.  Defendants allege that the inclusion of "Future Accused Units" and "Accused Development Spend" as part of the report's damages calculation are legally erroneous and that the methods employed to value the RTA technology and apportion the value of the accused RTA bubble mode are arbitrary and unreliable.  *See id.* at 10–12.

The Court addresses each Daubert motion in turn below.

### a. SAIC's Daubert Motion

SAIC alleges that the opinions presented by Ms. Schenk, Dr. Villasenor, and Dr. Farid fail to meet the standards for admissible expert opinion under FRE 702 and FRE 703.  Furthermore, SAIC requests that the Court preclude Microsoft's fact witnesses ████████ and ████████████ from presenting what SAIC alleges is improper lay opinion testimony.

27

### 1.  Schenk Report

SAIC claims that Ms. Schenk's opinions on the impact of the alternative RTA modes in reducing or limiting damages are unsupported by the record.  SAIC Daubert at 28–29.  First, SAIC alleges that Ms. Schenk relied on conversations with fact witnesses without conducting any further analysis, thereby acting as a mouthpiece for the hearsay of the fact witnesses she spoke with.  SAIC Daubert – SAIC Reply at 5, 15–16.  Additionally, SAIC contends that Ms. Schenk overly relied on Dr. Villasenor's rebuttal report and conversations with him, which were themselves unsupported beyond mere reliance on conversations with fact witnesses.  SAIC Daubert at 28–29; *see infra* Section III(C)(a)(2).  SAIC also asserts that to the extent that Dr. Villasenor's conversations with Ms. Schenk exceeded the scope of what he disclosed to SAIC through his own report, Defendants should be prohibited from "sneak[ing] testimony from Dr. Villasenor that is outside the scope of his reports into the record by letting Ms. Schenk introduce it as hearsay." SAIC Daubert at 29.

SAIC's arguments rely on a misunderstanding or mischaracterization of Ms. Schenk's role in the present action.  Ms. Schenk's role as a damages expert is to calculate damages by evaluating factors, such as the *Georgia-Pacific* factors, that are relevant to determining damages; at times, that analysis may include making certain assumptions, including regarding the availability and acceptability of non-infringing alternatives.  SAIC Daubert – Def. Resp. at 8, 15; *see Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (listing 15 factors the Court found to be generally relevant to determining a reasonable royalty for a patent license). It is not her role to evaluate the possibility of non-infringing alternatives herself, as that is a role best left to a technical expert, such as Dr. Villasenor.  *See* Schenk Rpt. ¶ 1 ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████; *see also Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303 (Fed. Cir. 2015), *reh'g en banc denied in part*, 805 F.3d 1382 (Fed. Cir. 2015) (holding it was proper for district court to conclude that "[f]or areas outside her expertise," a damages expert "could, indeed must, rely upon . . . other experts . . . ."); *Greatbatch Ltd. v. AVX Corp.*, No. 13-723, 2015 WL 9171042, at *5 (D. Del. Dec. 11, 2015) (explaining how an expert's consideration of the opinions of another expert's testimony when he lacked expertise in a certain technical area "mak[es] [the expert's] testimony more, not less reliable").

Rather, Ms. Schenk's role was to calculate an appropriate damages amount that could be sought by SAIC should this Court find the Government liable for infringement.  Schenk Rpt. ¶ 1. When Ms. Schenk's report is reviewed with this role in mind, it is clear that Ms. Schenk did, in fact, apply her own expertise and analysis to the facts at hand to arrive at her opinions.  Ms. Schenk's reliance on conversations with fact witnesses or Dr. Villasenor does not amount to her being a "mouthpiece" for those witnesses.  She is not merely parroting their statements, but rather, applying those statements to a hypothetical negotiation, pursuant to *Georgia-Pacific*, to determine how the presence of non-infringing alternatives or their costs would affect a royalty rate.  *See generally Georgia-Pacific Corp.*, 318 F. Supp. at 1116.  For example, while Ms. Schenk describes her understanding, based on discussions with Mr. Kissinger, Mr. Coffman, Dr. Villasenor, and review of Dr. Villasenor's report, that other RTA modes may serve as non-infringing alternatives, she does so within the context of evaluating how such alternatives would affect her analysis of a *Georgia-Pacific* factor.   Schenk Rpt. at 7, ¶¶ 177–78 ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████



. She then proceeds to opine that

*Id.* ¶ 182.  Later in her report, she once again describes

*Id.* at 11, ¶ 198

.

Aside from her analysis of the impact of non-infringing alternatives on a hypothetically negotiated royalty rate, Ms. Schenk also addresses the alternatives when rebutting Mr. Haas' conclusions regarding damages.  *See, e.g.*, *id.* ¶¶ 289, 396.  For example, Ms. Schenk claims that Mr. Haas' royalty rate is overstated.  *Id.* at 3 (depicting a table of contents for Ms. Schenk's report, including                                                    ).  Reviewed within that context as opposed to as a stand-alone snippet,[14] one can see how Ms. Schenk's reiteration of her

---

[14] SAIC's Exhibit 2 to its Daubert Motion is a compilation of excerpts of Ms. Schenk's report it deems relevant.  SAIC Daubert, Exhibit 2, Expert Report of Kimberly J. Schenk (ECF No. 350-2).  It excerpts the Table of Contents, showing that internal pages 106 through 129 focus on Ms. Schenk's contention that                                    *Id.* at 3.  The exhibit, however, only includes pages 128 and 129 of that sub-section, making it difficult to fully ascertain the context within which Ms. Schenk's statements on those two pages are situated.  Defendants also attached excerpts of Ms. Schenk's report as Exhibit 2 of their Response to SAIC's Daubert Motion,

understanding of potential non-infringing alternatives fits into her broader analysis of the accuracy of Mr. Haas' royalty rate.  *See id.*; *see also id.* ¶ 396.

SAIC's objections to Ms. Schenk's reliance on Dr. Villasenor's report and conversations with him are, likewise, unfounded.  It is permissible for one expert to rely on the opinions of another expert in reaching her conclusions.  *Carnegie Mellon Univ.*, 807 F.3d at 1303, *reh'g en banc denied in part*, 805 F.3d at 1382 ("For areas outside her expertise," a damages expert "could, indeed must, rely upon . . . other experts . . . .");  *Greatbatch Ltd.*, 2015 WL 9171042, at *5 (explaining how an expert's consideration of the opinions of another expert's testimony when he lacked expertise in a certain technical area "mak[es] [the expert's] testimony more, not less reliable").  To the extent that SAIC's objections to Ms. Schenk's reliance on Dr. Villasenor's report is based on its allegations that Dr. Villasenor's opinions are themselves inadmissible, this Court finds such objections unpersuasive, as explained further below.  *See infra* Section III(C)(a)(2).

SAIC also notes its concern that Defendants seek to "sneak testimony from Dr. Villasenor that is outside the scope of his report" through Ms. Schenk, alluding to the possibility that Dr. Villasenor's conversations with Ms. Schenk may go beyond what he addressed in his report.  SAIC Daubert at 29.  However, there is no indication, other than mere speculation from SAIC, that Ms. Schenk relied on supposedly never-disclosed, first-in-time assertions from Dr. Villasenor in reaching her damages calculations and opinions.  With regard to the contested portions of Ms. Schenk's report concerning the other modes non-infringing alternatives, her citations to "Discussion[s] with John Villasenor" support assertions that can easily be found in Dr. Villasenor's report as well—that there are three RTA modes, two of which are not accused of

---

but it too only includes three pages from the pertinent sub-section.  SAIC Daubert – Def. Response, Exhibit 2, Expert Report of Kimberly J. Schenk (ECF No. 366-2) at 28–30.

infringing the '230 Patent, and therefore can serve as non-infringing alternatives.  *See* Schenk Rpt. ¶¶ 178 n.325, 281 n.511, 396 n.732; *see also* Villasenor Rpt. App. C ¶¶ 91–94.  At any rate, SAIC had the opportunity to depose both Dr. Villasenor and Ms. Schenk on the nature of their conversations.  *See* Deposition of John Villasenor, dated Dec. 13, 2022 (ECF No. 340-5); Deposition of Kimberly Schenk, dated Dec. 12, 2022 (ECF No. 350-12).

Finally, SAIC contests the reliability of Ms. Schenk's opinion that ███████████ ███████████████████████ decreases the value of the '230 Patent.  SAIC Daubert at 24; *see* Schenk Rpt. ¶¶ 98, 175, 179–81, 188, 286, 297, 396–99.  SAIC claims that Ms. Schenk assumes that ████████████████████████ purely based on conversations with Microsoft witnesses or Dr. Villasenor's own opinions, which SAIC contests as equally unreliable.  SAIC Daubert at 24; *see infra* Section III(C)(a)(2).  As explained previously, this Court's prior grant of summary judgment regarding Microsoft's ████ devices renders SAIC's arguments on Ms. Schenk's opinions regarding ████████████████, including her reliance on Microsoft fact witnesses, moot.  *See* Combined Summary Judgment Opinion at 151.

## 2. Villasenor Report

SAIC claims that Dr. Villasenor's opinions on the other modes non-infringing alternatives theory are conclusory and unreliable.  SAIC Daubert at 22–23.  In concluding that the other RTA modes constitute non-infringing alternatives, Dr. Villasenor relies, in part, on conversations he had with Mr. Coffman and Mr. Kissinger.  *See* Villasenor Rpt. App. C. ¶ 92 n.41 ███████████ ██████████████████████████████████████████████████ ██████████████████████████████.  SAIC characterizes Dr. Villasenor's resulting opinion as nothing but "repeating what he has been told."  SAIC Daubert at 22.

This Court disagrees with SAIC's characterization of Dr. Villasenor's process in reaching his opinions.  Dr. Villasenor relied on conversations with fact witnesses as evidence that other RTA modes, which have not been accused of infringement by SAIC, exist and that these modes are currently in use and accepted by soldiers in the field.  *See* SAIC Daubert – Def. Resp. at 7. Such conversations, however, were not the end product, but instead, they served as the underlying factual evidence that Dr. Villasenor then applied his technical expertise to in order to conclude the other RTA modes are non-infringing alternatives because ███████████████████████ ███████████████████████████.  *See* Villasenor Rpt. App. C ¶¶ 91–94.

SAIC alleges that Dr. Villasenor's report includes "nothing to show that these alternatives would be accepted by the Government or that they provide the same benefits as the accused technology."  SAIC Daubert at 22–23.  SAIC argues that Defendants must do more than simply point to the existence of alternatives to prove they are non-infringing alternatives, but instead, must prove that the modes are available and acceptable.  SAIC Daubert – SAIC Reply at 13; *see Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1361 (Fed. Cir. 2012); *Nease v. Ford Motor Co.*, 848 F.3d 219, 234 (4th Cir. 2017).  However, Dr. Villasenor's report does not merely state that modes generally exist in the market.  Rather, Dr. Villasenor explains that ███ ██████████████████████████████████████████████ ███████████████████████.  Villasenor Rpt. App. C ¶ 92.  As such, the facts of *Nease* are distinguishable from the facts in the present matter.  In *Nease*, the court held that the defendant's argument that an alternative was *generally* in use for decades was insufficient to establish that the alternative constituted an acceptable non-infringing alternative.  *Nease*, 848 F.3d at 234.  In contrast, Dr. Villasenor's opinion that the other modes constitute non-infringing

alternatives is based on █████████████████████████████████████████████

████████████████████. Villasenor Rpt. App. C ¶ 92.

      SAIC also takes issue with Dr. Villasenor's opinions regarding Microsoft's ████ devices.

SAIC claims that Dr. Villasenor's extension of his other modes theory to the ████ devices is

unreliable and unsupported on account of his alleged failure to "analyze anything about █████

three modes of RTA, much less to consider the differences between ████ and ENVG-B." SAIC

Daubert at 23–24. SAIC also argues that the Court should prevent Dr. Villasenor from testifying

at trial on ████████████████████████████████████████████████████

████████████████████. SAIC Daubert at 16–21. As noted, this Court's prior

grant of summary judgment regarding Microsoft's █████ devices renders SAIC's arguments on

Microsoft's devices moot. *See* Combined Summary Judgment Opinion at 151.

### 3. Farid Report

      SAIC argues that Dr. Farid's analysis that ██████████████████, on which Dr.

Villasenor purportedly relied, likewise fails to satisfy the criteria for admissible expert opinion.

SAIC Daubert at 21–22. As such, SAIC contends that portions of Dr. Farid's opinion are

inadmissible. The portions of Dr. Farid's report that SAIC seeks to exclude relate solely to

Microsoft's source code, ████████████████████. Farid Rpt. ¶¶ 36, 37, 40–45; *see* SAIC

Daubert at 8–9. As previously explained, this Court's prior grant of summary judgment regarding

Microsoft's ██████ devices renders SAIC's arguments to exclude portions of Dr. Farid's opinion

████████████████ moot. *See* Combined Summary Judgment Opinion at 151.

### 4. Microsoft Fact Witnesses

      SAIC argues that based on Dr. Villasenor's and Ms. Schenk's reports, it appears likely that

Microsoft intends to present what amounts to expert opinions through lay witnesses, specifically

████████ and ████████████. SAIC Daubert at 30–32. In addition to claiming that the expected

34

testimony of ███████ and ███████ likely constitutes improper lay opinion, SAIC claims that any testimony from ███████ and ███████ on ███████ is purely speculative and thus inadmissible under FRE 602.  SAIC Daubert at 31; *see* FED. R. EVID. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter . . . .").

The portions of Dr. Villasenor's and Ms. Schenk's reports that contain references to conversations with ███████ and ███████ are limited purely to Microsoft's ███ devices. *See* SAIC Daubert at 30–32 (listing nine instances in the Villasenor and Schenk reports citing discussions with Microsoft fact witnesses on the ███ devices/system ███████ that SAIC alleges constitute improper lay opinion).  As previously explained, this Court's prior grant of summary judgment regarding Microsoft's ███ devices renders SAIC's arguments ███████ ███████, including its arguments to exclude testimony from ███████ and ███████ on Microsoft's ███ devices/system ███████, moot.  *See* Combined Summary Judgment Opinion at 151.

For the reasons stated, this Court **DENIES** SAIC's Daubert Motion to Exclude Testimony Regarding Alleged Non-Infringing Alternatives (ECF No. 350), as it pertains to non-Microsoft-based theories and witnesses and **DENIES** as moot SAIC's Daubert Motion to Exclude Testimony Regarding Alleged Non-Infringing Alternatives (ECF No. 350), as it pertains to Microsoft-based theories and witnesses.

### b.  Defendants' Daubert Motion

Defendants argue that Mr. Haas' methodology in calculating damages is unreliable and thus inadmissible under FRE 702.  Def. Daubert at 6; *see* FED. R. EVID. 702.  As such, Defendants

request that this Court exclude portions of Mr. Haas' report and preclude him from testifying at trial about the topics identified below.

### 1. Lump Sum Estimate

Defendants contend that by including royalties for Future Accused Units into his calculation of lump sum damages, Mr. Haas ignores the jurisdictional limits of this Court as embodied in 28 U.S.C. § 1498. *See* Def. Daubert at 12–13. Mr. Haas' lump sum base estimate, in which he claims to ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ Am. Haas Rpt. ¶ 93. Mr. Haas explains that ███████████████████████████████ ████████████████████████████████████████████████████████████████████ *Id.* ¶ 94.

In granting this Court jurisdiction over certain patent infringement actions, Section 1498(a) states:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture.

28 U.S.C. § 1498(a). Defendants argue that Section 1498(a) prohibits recovery of future royalties for future inventions because they have not yet been "used or manufactured." *See* Def. Daubert at 12; 28 U.S.C. § 1498(a) ("Whenever an invention . . . is *used or manufactured* . . . .") (emphasis added); OA Tr. at 235:5–6 (Government Counsel: "[T]he past tense of the statute, I think, is really important here."). In contrast to 35 U.S.C. § 271, Section 1498(a) deliberately uses the past tense in describing what circumstances confer jurisdiction of a patent infringement matter to the Court of Federal Claims. *Compare* 35 U.S.C. § 271(a) ("[W]hoever without authority makes, uses, offers

to sell, or sells any patented invention . . . .") *with* 28 U.S.C. § 1498(a) ("Whenever an invention . . . is used or manufactured . . . ."); OA Tr. at 252:14–17 (Government Counsel: "[Section 1498] has 'used' or 'manufactured' [in] a past tense.  Whereas, Title 35 does use a present tense.  We have to consider that the actual plain meaning of the statute itself carries weight.").

Section 1498(a)'s requirement that an invention be "used or manufactured" has been consistently interpreted to limit the Court of Federal Claims' jurisdiction to award damages "presently due and owing from the United States." *De Graffenried v. United States*, 228 Ct. Cl. 780, 783 (1981).[15]  For example, in considering this issue, in *Wright v. United States*, the court held, "According to 28 U.S.C. § 1498(a) . . . there are no provisions for including future procurement costs for expected making and using in the royalty base.  The statute provides relief only for units that are actually infringing."  53 Fed. Cl. 466, 471 (2002).  Likewise, in *Hitkansut LLC v. United States*, the court reiterated that it "does not have jurisdiction to award relief for future infringements."  130 Fed. Cl. 353, 395 (2017).  SAIC cites to *SecurityPoint Holdings, Inc. v. United States* to support its proposed inclusion of future accused units in the damages calculation, but *SecurityPoint* actually further undermines SAIC's argument by noting that "[d]amages beyond the date of judgment are not available in this litigation."  156 Fed. Cl. 750, 794 n.40 (2021).[16]

SAIC misses the mark in countering Defendants' argument.  SAIC characterizes Defendants' objection to Mr. Haas' calculation of a lump sum payment as merely an objection to lump sum damages.  *See* Def. Daubert – SAIC Resp. at 18 ("Defendants incorrectly, argue that a

---

[15] Decided by an appellate panel of the Court of Claims, *De Graffenried* is binding authority on this Court.  *See S. Corp. v. United States*, 690 F.2d 1368, 1370–71 (Fed. Cir. 1982).

[16] While such Court of Federal Claims cases are not binding, this Court finds the reasoning of such opinions persuasive here.

lump sum payment is not allowable . . . ."). Defendants' argument is more nuanced. Indeed, Defendants do not contend that Section 1498(a) prohibits lump sum damages, but rather, assert that Section 1498(a) prohibits the inclusion of any damages that account for future infringements. Def. Daubert – Def. Reply at 7; OA Tr. at 232:23–233:5 (The Court: "You don't dispute that lump-sum damages are appropriate in certain patent infringement actions, correct?" Government Counsel: "Absolutely correct, Your Honor. We do not dispute that lump-sum awards could be appropriate given the facts of a case. What we truly dispute is Mr. Haas' inclusion of future damages as part of the lump-sum base itself . . . .").

One potential form of permissible lump sum damages is one based on the hypothetically negotiated value of a fully paid-up license. *See SecurityPoint Holdings*, 156 Fed. Cl. at 777–78; Def. Daubert – Def. Reply at 10. This would be an alternative to a per-unit royalty. *Id.* Mr. Haas, however, appears to conflate the two by calculating a "lump sum" that applies a per-unit royalty rate to all accused devices that have been *and may still be* delivered. Am. Haas Rpt. ¶ 93

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ (emphasis added); OA Tr. at 236:1–8 (Government Counsel: "[W]e see that [Mr. Haas] has included damages for future infringements in lump-sum base. He does this by looking at the preexisting Microsoft, L3 and Elbit contracts, and he adds the future units that are contemplated but have not been used or manufactured by the Government, and he calculates the present value of these future units that have still not been used or manufactured.").

While Mr. Haas' inclusion of damages for future accused units may be administratively efficient, it is, nonetheless, legally erroneous under Section 1498(a). *See De Graffenried*, 228 Ct. Cl. at 783–84 ("[The Court] can only render money judgments for money presently due and owing

from the United States.  Plaintiff argues that it would waste effort to require it to bring suit for future infringements.  Nevertheless, relief for future infringements is beyond the power of the court by declaratory judgment or otherwise.") (internal citations omitted); OA Tr. at 235:15–18 (Government Counsel: "It might be easier if we could just resolve all of this right now, but the law is clear that the Court does not have jurisdiction even if this is a cumbersome process.").  No matter how seemingly unwieldy, the proper course of action to address future infringement is to address it *after* infringement has actually occurred, or alternatively, the parties may come to an agreement amongst themselves.  *See* OA Tr. at 254:1–8 (Government Counsel: "One [option] is that [Plaintiff] would have to bring a new suit.  And *De Graffenried* notes that that might be cumbersome, but this Court just doesn't have jurisdiction, unfortunately, in light of that.  But the parties could also come to an agreement, you know, should this case go to trial and there's a decision.  The parties could also come to an agreement as to the future.  So there's some flexibility there.").

Accordingly, given that Mr. Haas includes compensation for future accused units in his damages, portions of his report addressing his opinion on future accused units as well as any potential testimony on the same must be excluded pursuant to FRE 702.  *See Herbert*, 99 F.3d at 1117 ("Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories."); *Summit 6*, 802 F.3d at 1295; *see also* FED. R. EVID. 702.

### 2. Apportionment

Defendants argue that Mr. Haas' purported method of apportionment is arbitrary.[17]  Def. Daubert at 15–17.  Specifically, Defendants claim that Mr. Haas applies a one-third apportionment

---

[17] Defendants also initially claimed that Mr. Haas improperly relied on the Entire Market Value Rule (EMVR).  Def. Daubert at 23–24.  EMVR is a limited exception to apportionment that applies when the patented feature constitutes the basis for market demand.  *Lucent Techs, Inc. v. Gateway,*

to the RTA bubble mode based on the simple fact that it is one of three RTA modes. *Id.* at 16. To the extent Defendants acknowledge that Mr. Haas reviewed other material in reaching the one-third apportionment, Defendants take issue with the reliability of those materials as well. *Id.* at 16–17.

Defendants claim that the "1/3 number is *ipse dixit* pulled from the thin air; based solely on the fact that the accused 'bubble' mode is one of three modes," and that the present case is "exactly like" those in which the Federal Circuit has excluded a damages expert's testimony as "arbitrary *ipse dixit*." Def. Daubert – Def. Reply at 17–18; *see generally VirnetX*, 767 F.3d at 1329; *LaserDynamics, Inc.*, 694 F.3d at 69 ("[The expert's] one-third apportionment to bring his royalty rate down . . . appears to have been plucked out of thin air.").

The Court disagrees, as the facts of this case differ from those of the cases cited by Defendants. In *VirnetX*, the Court found testimony from plaintiff's damages expert on the royalty base inadmissible because the expert failed to "identif[y] a patent-practicing feature with a

---

*Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product"). In these limited circumstances, a patentee can recover damages based on the value of the entire device despite the presence of various features. *Lucent Techs.*, 580 F.3d at 1336. However, as acknowledged by SAIC and Mr. Haas himself, Mr. Haas never applied an EMVR analysis. Def. Daubert – SAIC Resp. at 35 ("Mr. Haas did not rely on the EMVR approach. In fact, nowhere in Mr. Haas' report does he mention EMVR. He also specifically disavowed Defendants' implication of EMVR in his deposition . . . .") (internal citations omitted); Deposition of David A. Haas, dated Dec. 8, 2022 (ECF No. 353-2) (Haas Depo. Tr.) at 161:3–11 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In their Reply, Defendants acknowledge SAIC's clarification, noting that "[b]efore Defendants filed the present motion, it was not clear whether Mr. Haas intended to rely on EMVR because of conflicting statements in his report and deposition." Def. Daubert – Def. Reply at 16 n.3. Given that the parties now agree that Mr. Haas did not intend to rely on EMVR, this Court accordingly limits its focus to the parties' remaining arguments regarding apportionment.

sufficiently close relation to the claimed functionality." 767 F.3d at 1329. That is not at issue here. Mr. Haas employed a thorough approach that identified the SSPPU with the claimed infringed functionality and then applied numerous quantitative and qualitative factors to arrive at his apportioned value of one-third for the RTA mode in question. *See, e.g.*, Am. Haas. Rpt. ¶¶ 54, 164–66. The facts of *LaserDynamics*, likewise, differentiate themselves from the facts in front of this Court. In *LaserDynamics*, the Court upheld the district court's conclusion that that the plaintiff's damages expert arbitrarily arrived at an apportionment value through "vague qualitative notions of the relative importance" of the patented technology. 694 F.3d at 69. Namely, Plaintiff had argued that various activities that are performed on a computer using a disk drive constitute a third of the value of the computer. *LaserDynamics, Inc. v. Quanta Computer Inc.*, No. 2:06-CV-348, 2011 WL 7563818, at *2 (E.D. Tex. Jan. 7, 2011). However, as pointed out by the district court, the activities plaintiff had listed, such as playing movies or transferring documents (among other examples), could be accomplished without the patented disk drive and also required interplay from other parts of the computer. *Id.* In contrast, the nature of the RTA modes in the accused devices are far more distinct from that of a disk drive, which is closely integrated with the other functions of a computer. The three modes are clearly delineated, and Mr. Haas' analysis specifically distinguishes the relative benefits and drawbacks of the different modes. *See* Am. Haas. Rpt. ¶¶ 54, 164–66.

As opposed to experts in cases cited by Defendants that rely solely on vague assertions or poorly explained apportionment methods, Mr. Haas carefully documents his approach and the underlying evidence in arriving at the one-third apportionment. For example, Mr. Haas relies on Dr. Bajaj's opinion in determining the value of the RTA modes. In his report, Dr. Bajaj presents

███████████████████████████████████████████████

███████████████████████████████████████████████

████████ Amended Opening Expert Report of Dr. Chandrajit Bajaj, Ph.D. on Infringement of U.S. Patent No. 9,229,230 (ECF No. 353-6) (Bajaj Am. Rpt.) ¶ 715.  Defendants argue that Dr. Bajaj, a technical expert, is not qualified to provide an opinion on the value of RTA mode.  Def. Daubert at 17; *see* Bajaj Depo. Tr. at 160:9–17 ███████████████████████████ ███████████████████████████████████████████.  Even regarding the technical aspects of RTA mode, Defendants argue that Dr. Bajaj's purported lack of relevant background or experience using the RTA technology makes him unqualified to opine on the relative value of various operational and technical benefits and drawbacks; Defendants claim that he should not be able to use those comparisons to place a relative value on each RTA mode. Def. Daubert at 19.  As such, Defendants argue that "given Dr. Bajaj['s] apportionment was unreliable input, Mr. Haas' damages opinion is unreliable output."  Def. Daubert at 20.

Defendants' objections to Mr. Haas' reliance on Dr. Bajaj's report appear, at times, to be aimed more at the substance of Dr. Bajaj's report rather than the methodology.  *See, e.g.*, *id.* at 19 (characterizing Dr. Bajaj's statements as conclusory).  Yet, Defendants do not move to exclude the portions of Dr. Bajaj's report that they question.  Def. Daubert – Def. Reply at 17 ("Defendants have not moved to exclude Dr. Bajaj's opinions relating to his technical analysis of the three RTA modes.") (emphasis omitted).  Dr. Bajaj is well within the bounds of expertise to conclude that he would ██████████████████████████████████████████████ ████████████ Bajaj Am. Rpt. ¶ 715 (emphasis added).  He need not have personally used the technology in the field to have the requisite expertise to opine on the technical benefits and drawbacks, as ascertained from his review of the technical issues pertinent to RTA modes.  *See*

42

Bajaj Depo. Tr. at 160:9–17 ███████████████████████████████████████
███████████████████████████████. Furthermore, it is undisputed that damages

experts, such as Mr. Haas, are permitted to rely on the opinions of technical experts, such as Dr.

Bajaj, in reaching their conclusions. *See Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,

876 F.3d 1350, 1369–70 (Fed Cir. 2017) (finding that it was proper for a damages expert to rely

on a technical expert's opinion to calculate and support a reasonable royalty rate); Def. Daubert –

Def. Reply at 17 ("Of course, a damages expert may rely upon a technical expert . . . .").

Defendants also question Mr. Haas' reliance on a survey of soldiers regarding their usage

of the RTA modes. Def. Daubert at 20–21. Mr. Haas states in his report that ███████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████ Am. Haas

Rpt. ¶ 163. Defendants argue, however, that the evidence Mr. Haas relies on ████████████

███████████████████████████████████████████████████████████████████.

Def. Daubert at 20–21 (citing Deposition of Mark Stephens, dated Aug. 1, 2022 (ECF No. 353-7)

(Stephens Depo. Tr.) at 120:6–21 █████████████████████████████████████████

█████████████). SAIC pushes back on Defendants' concerns on the survey relied upon by

Mr. Haas, arguing that Defendants' objections go to weight rather than admissibility. Def. Daubert

– SAIC Resp. at 32–35. This Court agrees. While Mr. Stephens' deposition testimony may raise

questions as to whether the soldiers merely used or, in fact, preferred RTA bubble mode, that is a

matter of diverging interpretation by the parties and amounts to a credibility question best left for

further exploration at trial.

Finally, Defendants severely understate the thoroughness of Mr. Haas' apportionment

methodology, claiming he "primarily relies" on Dr. Bajaj's opinion and aside from that, only relies

on the purported survey of soldiers to reach his conclusions.  *See* Def. Daubert at 17, 20.  This is clearly not the case.  Mr. Haas relied on   Am. Haas Rpt. ¶ 163

. He reviewed each of the awarded contracts.  *Id.*  ¶¶ 44–55, 57–68, 132.  He reviewed Government documents

*Id.* ¶¶ 133–35.  He cited testimony from Defendants' witnesses, such as Mr. Lloyd Luedtke, Mr. Mark Stephens, Mr. Kissinger, and Major General Anthony Potts

.  *Id.* ¶¶ 141 n.415, n.417.

Estimating a reasonable royalty, including through the apportionment process, is not an exact science, and "all approximations involve some degree of uncertainty."  *Summit 6*, 802 F.3d at 1296.  Perhaps Defendants would have preferred an apportionment derived from review of different materials than those upon which Mr. Haas relied, however, at this stage of proceedings it is not this Court's role to "inquir[e] on the correctness of the methodology and of the results produced thereunder."  *Id.*  Defendants' objections here implicate weight, not admissibility.

### 3.  Spare Parts

Defendants contend that Mr. Haas' method of comparing the value of spare parts (battery packs) that include the RTA technology with those that do not include the RTA technology is not an accepted methodology.  Def. Daubert at 24.  In his report, Mr. Haas proposes

.  *See* Am. Haas Rpt. ¶ 165.  Defendants argue, however, that there are a number of possible factors, such as the seller's market power or costs specific to the production of spare parts, that are wholly unrelated to the

value of the RTA technology but could drive the price of spare parts.  Def. Daubert at 25. Defendants also note that the prices of spare parts may be inflated, further skewing any resulting comparison.  *Id.* at 26 ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████ ; Def. Daubert – Def. Reply at 20.

Defendants' arguments, while noted, are better reserved for consideration at trial as they too implicate weight rather than admissibility.  Defendants correctly point out that SAIC does not cite to any cases or treatises that explicitly endorse Mr. Haas' spare parts methodology.  Def. Daubert – Def. Reply at 19.  The two cases cited by SAIC, *Honeywell Int'l Inc. v. United States* and *King Instruments Corp. v. Perego*, do not conclusively endorse Mr. Haas' method of comparing spare parts prices as part of his determination of a reasonable royalty rate.  Def. Daubert – SAIC Resp. at 39; *see Honeywell Int'l Inc. v. United States*, 107 Fed. Cl. 659, 685 (2012) (noting that the defendant's damages expert considered spare parts in analyzing damages); *King Instruments Corp. v. Perego*, 599 F.2d 941, 953, 958, 975 (Ct. Cl. 1979) (explaining whether a patentee may include spare parts in the royalty base).  The lack of cases or treatises explicitly endorsing Mr. Haas' methodology is not, however, dispositive.  *See Kumho Tire Co.*, 526 U.S. at 150–51 (explaining that the *Daubert* factors are not definitive and "do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged").  While there is an absence of case law explicitly endorsing Mr. Haas' methodology, there also is no case law explicitly prohibiting its use.

Furthermore, there appears to be no definitive evidence that the spare parts pricing is completely without any relation to the value of the RTA technology.  Despite Ms. Schenk's reservations about Mr. Haas' methodology, she could not identify any functional differences

between the spare parts other than the RTA functionality.  Schenk Depo. Tr. at 85:15–86:9 ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ ; *id.* at 87:3–13 ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ ; *id.* at 104:5–17 ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

Similarly, there is no definitive evidence before the Court that the prices of the battery packs are

inflated in such a way as to make the resulting price differential between compared packs unusable.

*See* Def. Daubert – SAIC Resp. at 40 (arguing that because Mr. Haas relied only on the price

differences between the spare parts, any purported inflation would impact both spare parts and

thus still result in a relative price difference); *see also* Schenk Depo. Tr. at 84:24–85:13 ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████.

While Defendants raise reasonable questions about Mr. Haas' comparison of spare parts

prices, such questions are better reserved for trial.  *I4i Ltd. P'ship*, 598 F.3d at 856 (quoting

*Daubert*, 509 U.S. at 596) ("As the Supreme Court explained in *Daubert*, '[v]igorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'"); *Apple*, 757 F.3d at 1314, *overruled on other grounds by Williamson*, 792 F.3d at 1349 (cautioning the Court against "overstep[ping] its gatekeeping role"); *Libas, Ltd. v. United States*, 193 F.3d 1361, 1366 (Fed. Cir. 1999) ("The difference between weight and admissibility . . . is in many instances a close question."). This Court fully expects Defendants to further explore the questions they have raised at trial, at which point this Court will evaluate the credibility and weight of any testimony related to Mr. Haas' spare parts methodology. For now, SAIC has provided enough evidence indicating that Mr. Haas' spare parts methodology meets the minimum threshold for admissibility at this stage.

### 4. Accused Development Spend

Defendants contend that Mr. Haas' inclusion of Accused Development Spend costs in the royalty base is unreliable and irrelevant. Def. Daubert at 6. Mr. Haas' damages calculation includes purported damages from the Government's research, testing, and development spend for Microsoft's ▮▮▮ devices. Am. Haas Rpt. ¶¶ 14, 16, 92. Mr. Haas explains that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶ 92. Defendants contend, however, that non-prototype development costs should be precluded from recovery on account of SAIC's failure to "reduce[] the bare teachings of the '230 Patent to practice." Def. Daubert at 11; *see also id.* at 13 (citing *Wright*, 53 Fed. Cl. at 473). Additionally, Defendants argue that there is no evidence that SAIC expected royalty payments for research and development nor that the Government would be willing to pay such royalties. *Id.* at 14.

Mr. Haas' inclusion of Accused Development Spend is limited to Microsoft's ▮▮▮ devices. *See* Deposition of David A. Haas, dated Dec. 8, 2022 (ECF No. 353-2) (Haas Depo. Tr.)

at 107:5–9 ████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████.  As such, this Court's prior grant of summary judgment regarding Microsoft's

████ devices renders moot Defendants' arguments contesting Mr. Haas' inclusion of Accused

Development Spend.  *See* Combined Summary Judgment Opinion at 151.

### D.  Conclusion

For the foregoing reasons, this Court **DENIES in part** SAIC's Daubert Motion to Exclude

Testimony Regarding Alleged Non-Infringing Alternatives (ECF No. 350), as it pertains to non-

Microsoft-based theories and witnesses; **DENIES in part as moot** SAIC's Daubert Motion to

Exclude Testimony Regarding Alleged Non-Infringing Alternatives (ECF No. 350), as it pertains

to Microsoft-based theories and witnesses; **GRANTS in part** Defendants' Joint Rule 702 Motion

to Partially Exclude the Amended Expert Damages Report of David A. Haas (ECF No. 353), solely

as it pertains to the "Future Accused Units" argument; **DENIES in part** Defendants' Joint Rule

702 Motion to Partially Exclude the Amended Expert Damages Report of David A. Haas (ECF

No. 353), as it pertains to the apportionment and spare parts arguments; **DENIES in part as moot**

Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Expert Damages Report of

David A. Haas (ECF No. 353), solely as it pertains to the "Accused Development Spend"

argument.

## IV.    Conclusion

For the reasons stated above, this Court **ORDERS** the following disposition of the parties'

motions.  Plaintiff SAIC's Motion to Strike Untimely Non-Infringing Alternatives and Non-

Infringement Theories (ECF No. 352) is **DENIED in part**, as it pertains to the other modes non-

infringing alternatives theory.  Plaintiff SAIC's Motion to Strike Untimely Non-Infringing

Alternatives and Non-Infringement Theories (ECF No. 352) is **DENIED as moot**, as it pertains to ██████████ non-infringing alternative theory.   SAIC's Daubert Motion to Exclude Testimony Regarding Alleged Non-Infringing Alternatives (ECF No. 350) is **DENIED**, as it pertains to non-Microsoft-based theories and witnesses.   SAIC's Daubert Motion to Exclude Testimony Regarding Alleged Non-Infringing Alternatives (ECF No. 350) is **DENIED as moot**, as it pertains to Microsoft-based theories and witnesses.   Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Expert Damages Report of David A. Haas (ECF No. 353) is **GRANTED in part**, solely as it pertains to the "Future Accused Units" argument.   Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Expert Damages Report of David A. Haas (ECF No. 353) is **DENIED in part**, as it pertains to the apportionment and spare parts arguments.  Defendants' Joint Rule 702 Motion to Partially Exclude the Amended Expert Damages Report of David A. Haas (ECF No. 353) is **DENIED in part as moot**, solely as it pertains to the "Accused Development Spend" argument.

The parties are directed to **CONFER** and **FILE** a Notice by January 5, 2024, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.

*Eleni M. Roumel*

ELENI M. ROUMEL
Judge

Dated: December 14, 2023
Washington, D.C.

49